JUAN RAMOS ET UX., Plaintiffs and Appellants, *v.* JUAN E. CARLO and UNITED STATES FIDELITY & GUARANTY COMPANY, Defendants and Appellees.

No. 12236. Decided May 4, 1962.

*J. Alemañy Sosa* for appellants. *Enrique Báez García* for appellees.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

In this action for damages the trial court found proved the following facts which are pertinent herein:

(1) That on December 2, 1955, defendant Juan E. Carlo was the owner of a grocery store shown on the photographs marked exhibits 1, 1(a), and 2, located at the intersection of León and Muñoz Rivera Streets of Mayagüez. One of the main doors of the store faced the corner of these two streets and it could be reached by the stairway shown in the said photographs.

(2) That the grade of the sidewalk as well as of the curb of the street in front of the stairway at the entrance of the store is quite steep, and there is also a pluvial grate on the curb with the same grade as the street.

(3) That on the day of the accident, around noontime, the plaintiff was walking down from east to west along Muñoz Rivera Street on the side where the defendant's store is located, and after crossing León Street, as she was about to step on the sidewalk in front of the entrance of defendant's store she became entangled in some metal straps of several cases which were lying on the curb and fell flat on her face on the sidewalk between the stairway and a lamppost shown on the photographs, as a result of which she fractured her left wrist.

(4) That when the accident occurred the sun was bright and the surface of the street, the curb, and the sidewalk was

completely dry, it having been further established that the plaintiff was walking slowly, that she was not distracted, and that there was nothing to prevent her from detecting readily the cases and metal straps which were lying on the curb at the corner of León and Muñoz Rivera Streets.

(5) In addition to the foregoing, the trial court made the following finding: "Although it was not specifically proved that the cases and metal straps in which the plaintiff became entangled when she sustained the accident had been placed on that corner by employees of defendant Juan E. Carlo, yet, in the light of the entire evidence heard and considering particularly the testimony of witness Juan Irizarry, it seems that we can validly conclude that those cases and metal straps came from defendant's store and that they were placed there by his employees."

In their reply brief the appellees contend that the evidence does not support the foregoing finding of fact. In view of such contention, we have examined closely the evidence in the record and there is no question that that finding of the trial court is substantially supported by the evidence. In resolving the conflicts in the evidence, the trial court obviously did not give credit to defendant Carlo nor to a witness for the defendants, who testified that at the scene of the accident he did not see any boxes nor metal straps when plaintiff fell, and, on the contrary, it gave credit, in addition to the plaintiff and his wife, to the testimony of witness Juan Irizarry, who apparently had no interest in the litigation. Witness Irizarry testified that for several years he was in charge of the sanitation of the Municipality of Mayagüez, and that on several occasions he had to intervene with the defendant because he placed in front of his establishment, on the corner of the street, empty barrels, boxes with metal straps, papers, pasteboard, and refuse from his business. On several occasions he called the defendant's attention that he should not keep those things there because

he was violating an ordinance, and that the latter said that he had no place for the garbage. The witness stated that during the four years that he was working in charge of the sanitation, the only case which he was never able to solve was that of the defendant. He said that he always saw garbage, rubbish, and metal straps there. In the morning of the day of the accident he saw boxes and metal straps, 3 or 4 boxes and some metal straps, in the corner of the street next to a lamppost. He said that it was embarrassing for him to call the defendant's attention any further because the proper thing to do, and which he had decided to do, was to file a complaint against him. In the morning after the accident and thereafter he did not see any garbage and rubbish there.[1]

The photographs mentioned by the trial court in its findings show that the place where the accident occurred was somewhat inconvenient for pedestrians. The defendant's establishment was situated in the corner, but the angle was cut by a bevel or diagonal section which was slightly larger than the width of the main door and which served as a wall and foundation to a four-step stairway leading to the floor of the establishment. Looking toward the entrance from the right-hand side of the building, the sidewalk is more or less level, but on the left-hand side the sidewalk has a marked downgrade which ends suddenly in the very corner in front of the stairway. Thus, the first step is about eight inches high on the right end, but it is practically nil on the left end. The edge of the sidewalk is round at the corner forming an arch. In the very corner, where there is still a downgrade, there is a pluvial grate with an opening constructed vertically on the border and underneath the sidewalk. Around the grate and drain inlet the street also slopes toward the corner.

---

[1] The witness for the defendants testified that there was a barrel on the corner of the street by the side of a lamppost. Defendant Carlo admitted that there was an empty barrel which *some employee took outside* and that the sidewalk was narrow.

On the corner, slightly to the right looking in the direction of the establisment, there is a lamppost standing on part of the sidewalk at the meeting point of the level sidewalk and that which slopes upward on the other side of the building. We do not know whether the foregoing gives a clear picture of the not too ideal condition of the place for pedestrians who cross the street trying to gain access to the sidewalk, as it appears from an examination of the photographs, but evidently that was no place for putting on a public thoroughfare and on a sidewalk the artifacts mentioned in this action without being grossly negligent and careless in not foreseeing, as it could be readily foreseen, that it could cause damage to another as it actually did to the plaintiff.

▆▆▆▆ The trial court did not conclude affirmatively that the defendant was negligent. It so assumed solely for the purpose of disposing of the case in the light of other considerations. It is clear that he was negligent in view of the circumstances described, and that this obligation to compensate the injured party arose from the act which was found proved and from his failure to foresee the consequences of such act. Sections 1041, 1042, and 1802 of the Civil Code (1930 ed.).[2] The fault or negligence is the failure to exercise due care, which also consists essentially in not anticipating and foreseeing the rational consequences of an act, or of the failure to perform an act which a prudent person could have foreseen under the same circumstances. The liability for fault or negligence depends on the probability of the consequences as they are liable to be foreseen by a prudent person. This is why the fortuitous act, which

---

[2] Section 1041.—31 L.P.R.A. § 2991—"Every obligation consists in giving, doing, or not doing something."

Section 1042.—31 L.P.R.A. § 2992—"Obligations are created by law, by... and by illicit acts and omissions or by those in which any kind of fault or negligence occurs."

Section 1802.—31 L.P.R.A. § 5141—"A person who by an act or omission causes damage to another when there is fault or negligence shall be obliged to repair the damage so done."

ordinarily exempts from liability, excludes the event which could have been foreseen. Section 1058. Or, as stated by José Castán speaking of juridical violations, "[T] he fault or negligence is actually defined as the *failure* to exercise the prudence required in the social relations which, if exercised, could have avoided an unlawful and unwanted result. To constitute negligence, it is sufficient that the result be foreseen as *possible* or *had to be* foreseen." (Author's italics.)[3] As stated by Barassi, quoted by Santamaría,[4] the necessity of an orderly social living imposes a general duty of correctness and prudence toward the other citizens, and the act is unlawful in the extracontractual sense when it violates the general duties of social correctness or of proper behavior, which duties are not written in the code but which represent the presupposed minimum inference of the order of social life.

Notwithstanding its findings of fact and what constituted an act of fault or negligence which caused the damage, the trial court refused to grant compensation for the damage. It held as a matter of law that defendant's conduct and negligence did not cause the same, "since the boxes as well as the metal straps were clearly visible and the plaintiff could have easily avoided this accident by merely turning off slightly in order not to pass by the place where the boxes were lying." That in choosing to pass over the metal straps, the plaintiff assumed the risk of her conduct and the accident should be attributed to her own lack of prudence. And further on it says: "The case would be otherwise if the plaintiff had been walking along that sidewalk with the intention

---

[3] 1-II *Derecho Civil Español, Común y Foral* 484 *et seq.* (9th ed. 1955). "The essence of the fault," he says, "lies in the lack of diligence and foresight on the part of the wrongdoer." 3 *op. cit.* 146 (8th ed. 1954).

According to Puig Peña, every act or omission which causes damage to another is presumed to be antijuridical, that is, contrary to law or illicit, 4-II *Derecho Civil* 571, and it shall cease to be so when there is in his favor a cause for exclusion of the antijuridicity.

[4] 2 *Comentarios al Código Civil* 947 (1958).

to continue walking along the same, since in that case and in the alternative of having to step down to the street, abandoning the safety of the sidewalk, it would not have been unreasonable if she had run the risk of passing over those straps, but since she was already on the street and since it would make no difference to her if she stepped on the sidewalk next to defendant's store by the same corner or slightly away from it, there is no question that the plaintiff exposed herself unnecessarily to suffer the fall in choosing to step on the sidewalk by the most dangerous place," citing *Quiñones* v. *Colom*, 71 P.R.R. 561.

Along the same line of thought adopted by the trial court in laying down the applicable law, the inverse seems more logical. Ordinarily, a person walking along a sidewalk because it is safer against traffic risks has more opportunity and time to reflect and to think in order to avoid a probable obstacle or danger, and she may even stop dead without further risks until the condition is cleared or eliminated, for which reason it would be *less reasonable* and *more negligent* if she would assume the risk as compared with a person who crosses a public thoroughfare, whose prudence and instinct of conservation warns her that she must abandon as soon as possible the place of danger such as the street and reach a place of safety such as the sidewalk, and whose attention is at that moment focussed on the impending risk rather than a risk which she might meet at a place in which ordinarily she would not expect to meet any or has the right to expect that none would arise.

In view of the evidence, the finding of the trial court charging the plaintiff with negligence to such an extent as to defeat her claim, finds no rational support in the facts, according to the version of the accident which was found proved. There are other indisputable facts in the record, as shown by the evidence of both parties, which give a more complete picture of all the circumstances present at that

place. At the other corner of the street along which the
plaintiff was walking there was a building under construc-
tion which was protected by a fence or zinc enclosure which
is customarily placed in those cases. This prevented travel-
ing on the sidewalk and it prevented plaintiff from doing so
before crossing from the opposite sidewalk, from where she
could have readily noticed the opposite sidewalk toward
which she was headed and formed the optative judgments
referred to in the judgment. As a result of the construction
there were also stones, rubbish, and pieces of rod on the
street which the plaintiff was crossing, which undoubtedly
compelled her to be on the lookout, in addition to the vehicles
and other traffic hazards, to these other potential risks. From
an examination of the photographs it appears that the most
convenient place for stepping on the sidewalk is at the end
of the grade where the lamppost stands, but according to the
evidence offered by the defendants there was a barrel on the
street by the side of the post.

The plaintiff, a woman 60 years of age, was returning
home from work at noontime, and she describes the occurrence
as follows:

"As I crossed like this and was about to step on the side-
walk of Juan Carlo, there was a loose strap from some boxes
*which looked like the street and I did not see it and I became
entangled* and fell on the sidewalk.

. . . . . . . . .

"I became entangled in some metal straps from boxes which
were on the sidewalk. *I did not see the strap in which I
became entangled because it was of the same color as the
sidewalk.*

. . . . . . . . .

"Q.—You say that you became entangled, in what? A.—In
a strap of some cans, of some boxes, which was lying on the
sidewalk. Q.—Where were the boxes? A.—On the curb; *but
the straps were on the sidewalk and I did not see them.* Q.—
So the boxes were on the curb and the straps on the sidewalk?

346

A.—Yes, sir. Q.—So you became entangled in the straps? A.—Yes, sir.

. . . . . . . . .

"[Defendants] Q.—What sidewalk did you take when you came walking along Muñoz Rivera Street, the right-hand or the left-hand sidewalk? A.—The left; *but I was walking along the street because there was a zinc fence* . . . Q.— Before reaching the corner of the accident, were you walking along the street? A.—Yes, because there was a zinc fence, and then as I stepped on the sidewalk...

. . . . . . .

"Tell me, what precautions did you take to stop from falling? A.—Well, *when I realized it I was entangled in the strap.* Q.—Where you looking backwards or forward? A.— Forward, *but since the straps were practically the same color as the sidewalk...* Q.—What color is the *sidewalk?* A.—Sort of gray, like cement. Q.—And what color were the straps? A.— The same color."

After testifying that she was not reading, nor distracted, nor worried about anything:

"Q.—Why did you *not avoid* the straps? A.—*If I had seen them I would not have fallen.*"

The plaintiff insisted at all times throughout the lengthy cross-examination, without being contradicted, that the straps were on the sidewalk although the boxes from which they were hanging were on the curb; that when she stepped on the sidewalk she became entangled in them; that she did not see them and that they were of the same color as the sidewalk. In fact, we have before us a strap admitted in evidence which the plaintiff and her husband took from the scene of the accident. It is made of flexible metal, quite hard, 3 feet 3 inches long by one-fourth inch wide, and its gray color looks very much like and is easily confounded with the usual gray color of cement sidewalks.

The defendants did not controvert the foregoing evidence nor attempted to show by other evidence that the straps were readily visible or distinguishable, or that the plaintiff

deliberately chose to walk over them being aware of their presence or having had a reasonable opportunity to notice them or of being warned, or that she otherwise acted blindlessly or heedlessly against her own security. Their theory and their evidence—the testimony of only one witness who testified that he witnessed the fall—was to the effect that there were no boxes, nor straps, nor similar objects in the place. However, the trial court did not give credit to this evidence in finding as a proved fact that as the plaintiff stepped on the sidewalk she became entangled in some box straps which were lying on the curb and fell on her face. In the light of the uncontroverted evidence, the finding of fact of the trial court to the effect that there was nothing "to prevent the plaintiff from readily noticing the boxes and the straps" does not find sufficient support in the evidence; neither as a directly proved fact nor as an inevitable inference from the fact testified to by the plaintiff herself that when she fell the sun was bright, the street was dry, and that she was walking slowly and was not distracted, against persuasive and uncontroverted evidence that even under the circumstances described she could not see the straps. The conclusion of law based on that finding of fact to the effect that the plaintiff could have *readily* avoided the accident by *not choosing* to step over the straps, and that in so *choosing* she assumed the risk of her conduct, and that the cause of the accident was her own lack of prudence, therefore falls by the wayside. It may be conceded that under the circumstances of this case the boxes were visible or could be seen at a certain distance by a person with normal eyesight, but the plaintiff does not allege that she came in contact with the boxes or injured herself with them. On the contrary, since the straps were attached to or near the boxes, the ordinary visual phenomenon is that the eye will rest, as a whole, on the object of greater size, unless one has it in the mind to fix the attention on some particular point or detail. The presence of the

boxes could have been precisely an additional fact which would not permit the plaintiff to notice the straps in time.

Under the circumstances of this case as they appear from the record, the plaintiff can not be charged with any degree of negligence which would defeat her right to recovery. However, irrespective of the absence of actual basis, the judgment would not be acceptable either on the legal doctrine on which it is predicated, in the light of the criteria stated by this Court, and in the light of a doctrine representing a more adequate balance of the rules of liability which should be imposed on pedestrians traveling on public sidewalks. *Cf. Montval* v. *López Hnos., S. en C.*, 41 P.R.R. 437 (a germane case in which the injured party became entangled in some wire thrown on the sidewalk by an establishment where boxes were made, and in which it was alleged unsuccessfully that she assumed the risk because the circumstance was "known" to her and she could have "avoided" the fall); *Davidson* v. *H. I. Hettinger & Co.*, 62 P.R.R. 286, 291 *et seq.*; *Font* v. *Viking Construction Corporation*, 58 P.R.R. 691, 699 *et seq.*; *Martínez* v. *Báez*, 63 P.R.R. 751; *Echevarría* v. *Despiau*, 72 P.R.R. 442, 447; *Palmer* v. *Barreras*, 73 P.R.R. 266, 269 (the elements of assumption of risk are given); *Vélez* v. *The Capital*, 77 P.R.R. 663, 670.

To uphold the judgment in its legal reasoning would be tantamount to laying down the rule that an adjoining property owner or any neighbor, in disregard of his general duty of correctness toward the other citizens, as BARASSI would say, may create dangerous conditions on sidewalks without being civilly liable, imposing on the pedestrian using them the duty to be constantly on the lookout for his safety. A transient traveling on the sidewalks should observe a normal degree of care under the surrounding circumstances, but he is under no obligation to keep constantly on the lookout to discover traps and dangerous conditions created by the carelessness of another. As stated in the

*Hettinger* case, *supra*, a pedestrian "is not required to walk and to gaze continuously at the ground in order to avoid any possible accident which might occur owing to the negligence of a third person"... or "he does not necessarily have to walk on a street other than that in which the accident occurred, even if he knows the dangerous condition of the latter." The case of *Quiñones* v. *Colom*, cited by the trial court, is clearly distinguishable from the situation herein.

■ Public sidewalks constitute or should constitute a privileged place for pedestrians in the safety of their persons. Also for an inexpert child who walks heedlessly, as well as for a more conscientious adult who meditates on his preoccupations; for the one with perfect eyesight and for the short-sighted; for the young and alert as well as for the aged. With the ever increasing scale of the motorized traffic and the increasing danger in the congested public thoroughfares, what has been said is of greater importance nowadays than at the time of the *Montval* case in 1930 and when some of the other cases were decided.[5]

■ We conclude that the plaintiff did not commit, as a matter of fact nor as a matter of law, any kind of negligence which would lead her to assume responsibility for her fall, and on this reasoning we hold that the defendants are bound to compensate her.

Assuming, however,[6] that the evidence would warrant a conclusion that she contributed some degree of negligence or lack of care, even then, in our opinion, it was not proper to relieve the negligent defendants from all liability in our

---

[5] It is shocking to note the indifference in permitting—a thing which is seen daily in going and coming—commercial establishments, in using public property as private property, to display permanently on the sidewalks during the daytime bulky and large-size merchandise, some times leaving hardly any room on the edge of a narrow sidewalk for pedestrians to travel, with grave risk to the security of citizens, even on the more congested thoroughfares.

[6] For the purposes of the decision of the case, this portion may be regarded, if desired, as dictum.

positive civil law. This should be so because § 1042 of our Civil Code (§ 1089 of the Spanish Code) creates the obligation for any acts or omissions in which *any* kind of fault or negligence occurs. One who commits the culpable or negligent act or omission should always be liable, in such *measure* as may be required, but he shall not be exonerated completely.[7]

Speaking in general on the juridical acts and facts, JOSÉ CASTÁN explains it as follows: "While the contractual fault can be mitigated and is based on the distinction of its two aspects, the fault, properly speaking, and the deceit, in the extracontractual fault, do not have, on the contrary, any interest, nor this distinction, nor the mitigations of the fault. The wrongdoer *is always liable for the damage*, whether he has caused it deceitfully or through *mere negligence* and *regardless of its degree*, for even the slightest fault (1) is taken into account because this type of fault affects the relations of social interest rather than the private interest. (1) Hence, the Roman rule: *In lege Aquilia et levissima culpa venit.*" (Italics ours.) 1–2 *op. cit.* 490 (9th ed.). Further, 4 *op. cit.* 826 (8th ed.), referring specifically to the Aquilian fault, he repeats: "We have already said that the theory of mitigations of the fault has no interest in the extracontractual fault, since the *wrongdoer is always liable* for the damage, regardless of the degree of the fault. Thus, § 1089 of our Code speaks of 'any kind of fault or negligence.' Otherwise, the judicial authority will weigh the lack of diligence, in the case of this liability, *as well as* in the case of contractual fault . . . bearing in mind the circumstances of each particular case." (Italics ours.) ROBERTO DE RUGGIERO holds the same view—1–2 *Instituciones de Derecho Civil* 130 (4th Italian ed.)— "these categories [degrees] are important only as respects the contractual fault, not as respect the

---

[7] In so stating, we are not taking into account at all Act No. 28 of June 9, 1956 (Sess. Laws, p. 86).

Aquilian fault, in which the strictest requirement provided by the law for the purpose of exacting full and complete liability for every culpable act (§ 1751 *et seq.*), including the slightest . . . forecloses the possibility of mitigating the liability." Other text writers hold the same view.

The problem therefore hinges on the area of causation, under any of the theories discussed, proximate, adequate, or that of the equivalence, in which according to CASTÁN all the antecedents constituting faults in necessary relation to the damage for the purposes of a gradual participation of the liability are taken into account, unless *one is so serious* as to *absorb* all the others. In their comparative annotations on 1–II ENNECCERUS, *Derecho de Obligaciones* 84, GONZÁLEZ Y ALGUER comment that no Spanish positive precept is a serious obstacle to the doctrine which vests the judicial trier with full power to apportion the damage equitably whenever the fault of the agent and that of the aggrieved party concur. "This is our opinion," they say, "not only because it is a logical consequence of the principles on causal relation—which recognizes as cause that condition which is adequately connected with the wrongful result . . . and which, therefore, does not foreclose the possibility of the concurrence of two conditions which imply the adequate connection of the damage—but also because the courts are empowered to mitigate, as the case may be, the liability arising from the fault (§ 1103 [§ 1056 of our Civil Code]),* and it can not be said that this power exists only in connection with contractual obligations. The agent's liability thus mitigated and his obligation to compensate being proportionately reduced, the damage is impliedly apportioned with the aggrieved party. Consequently, we believe that the doctrine laid down in the text is applicable to the Spanish law, it being sufficient to seek

---

* "Liability arising from negligence in the fulfilment of all kinds of obligations is also demandable; but it may be mitigated by the court according to the circumstances of the case."

recovery in order that the court may *de officio* mitigate the liability. (*Cf.* Judgment of May 14, 1920.)" And CASTÁN, citing GONZÁLEZ Y ALGUER, also refers to the Judgments of January 18, 1936 and July 10, 1943, which deal with the possibility that the concurrence of fault may be *compensated or apportioned* between the agent and the aggrieved party, and those of May 24, 1947 and March 13, 1953, to the effect that in order to apportion the concurrence of fault it must be of the same degree and identical juridical virtuality.  3 *op. cit.* at 173; 4 *op. cit.* at 829.

In his treatise on *Responsabilidades Derivadas de Culpa Extracontractual Civil* 95–101 (2d ed. 1958), ANTONIO BORRELL MACÍA has no doubt that "not all negligence of the victim will relieve the wrongdoer at fault from liability" and that in such case it is necessary to examine the greater or lesser degree of the fault, the greater or lesser duty of both wrongdoers to be on the lookout.  Analyzing the authorities of the Supreme Court as to whether compensation should be granted if there is concurrence of fault, he states: "However, in the Judgment of October 14, 1957 it declares that the courts may mitigate the agent's liability and reduce in proportion his duty to compensate by apportioning the damage with the aggrieved party.  The influence of the aggrieved party's fault, he adds, has been repeatedly recognized by the authorities as a derivation of the necessity of the causal relation between the compensable act and the damage (Judgments of March 7, 1902; June 16 and December 22 and 23, 1905; June 13, 1923; May 5, 1925; December 22 and 27, 1928; and October 26, 1930) ; and although the Judgment of December 21, 1910 attributes the damage to the agent after finding that both parties were at fault, despite the reality of the aggrieved party's negligence, the Judgments of January 18, 1936 and July 10, 1943, recognize the possibility that the concurrence of fault may be compensated or apportioned between the agent and the aggrieved party.  The

same conclusion is reached by exercising the power of the courts to mitigate, as the case may be, the liability arising from fault (§ 1103 of the Civil Code), because this exclusive power can not be considered in relation to the contractual obligations, wherefore the agent's liability being thus mitigated and his duty to compensate reduced proportionately, the damage is impliedly apportioned with the aggrieved party . . . the trial court which, in the exercise of its powers, has apportioned the damage equitably by reason of the concurrence of the agent's fault . . . The Judgment of June 19, 1957 is to the same effect." See the elaborate analysis of this question made by LEONARDO COLOMBO, *Culpa Aquiliana* 179–85, most of which was reproduced by Mr. Justice Ortiz, Mr. Justice Belaval concurring, in *Irizarry* v. *People*, 75 P.R.R. 740, 761 *et seq.* The French doctrine has followed the same trend of thought. We believe, within our positive law, that even though the plaintiff had been negligent it was not proper either to relieve the defendants at fault from all liability.

We shall then render the judgment which should have been rendered by the trial court. The plaintiff sustained a fracture of the head of the radial bone of the left arm, the wrist. During the first months she experienced intensive pains which did not let her sleep, and swelling of the hand, undergoing diverse treatments. She could no longer sew nor perform other work. In a certificate—evidence for both parties—issued on April 11, 1956, more than four months after suffering the fracture, it is stated that the condition of the left hand had improved and that she could close the hand enough to grab an object the size of a broom stick, and that the swelling had subsided although she complained of pain. If she exercised regularly, the disability would not be more than 50 per cent. At the time of the trial the disability of the function of the hand was about 40 or 50 per cent. There was contraction of the slightly atrophied muscle and

some ankylosis when raising the arm. At the time of the accident the codefendant U.S. Fidelity & Guaranty Co. had issued a public-liability policy in favor of defendant Carlo up to a $5,000 limit.

For the reasons stated, the judgment appealed from will be reversed and another rendered ordering defendants Juan E. Carlo and U.S. Fidelity & Guaranty Co. to pay solidarily to the plaintiffs the sum of $6,800 as full compensation for the damage resulting from the accident herein involved, codefendant U.S. Fidelity & Guaranty Co. being liable up to the sum of $5,000, the costs of the proceeding including the appeal, and $500 for attorney's fees in the trial court.